**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 26-21899-Civ-BECERRA/TORRES**

ULTRA MARINE EUROPE, s.r.o.,

*Plaintiff*,

v.

ULTRA MARINE WEST, INC.,

*Defendant*.
______________________________________/

***ORDER ON***
***PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION***

Plaintiff Ultra Marine Europe, s.r.o. is a distributor of high-end marine parts. It moves under Federal Rule of Civil Procedure 65 to enjoin Defendant Ultra Marine West, Inc. from using the "ULTRA MARINE" word mark, the stylized logo at issue, and "any 'Ultra'-branded" logo, pending trial on Plaintiff's claims for trademark infringement, counterfeiting, and copyright infringement. The rights Plaintiff asserts come, at bottom, from a written Distribution Agreement with the Turkish manufacturer of those marine parts, Boyut Makina Sanayi ve Ticaret Limited Şirketi ("Boyut"). That Agreement grants Plaintiff exclusivity in a defined Territory — Seychelles, Mauritius, and the countries of Europe, excluding Turkey — and forbids Plaintiff from commercializing the Products anywhere else. It notably says nothing

about the United States, except to place the United States outside the scope of what Plaintiff was permitted to do. Faced with this record, Plaintiff's case for showing a substantial likelihood of success is made that much more difficult.

Apart from that problem, Plaintiff's own pleading dates its first United States use to 2015, yet Defendant's evidence reaches back to 2006. Plaintiff's ownership of the asserted logo rests on a chain of title with documented gaps. And the Agreement underlying all this is governed by Turkish law that no party has briefed. In the face of all this, the uncertain likelihood of success on its claims is further undermined by a tenuous showing of irreparable harm.

A preliminary injunction is "an extraordinary and drastic remedy," one "never awarded as of right" and reserved for the clear case. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). This is not that case. Because Plaintiff has not carried its burden on either of two key requirements, a substantial likelihood of success on the merits, and a likelihood of irreparable harm, the motion is due to be denied.

## *I. BACKGROUND*

The Court draws the following from the parties' papers, the supporting declarations and exhibits, and the testimony elicited at the evidentiary hearing held on April 9, 2026. Following the hearing, and as the Court directed, Plaintiff filed a Reply in support of its motion [D.E. 42] and Defendant filed a Sur-Response [D.E. 46]. The Court has considered both supplemental filings as well.

### A. ***The Marks and the Parties***

Defendant's position, supported by sworn testimony, is that Boyut developed the "ULTRA" anchor brand in 2004–2005 and sold ULTRA-branded marine anchors into United States commerce beginning in 2006 through a U.S. distributor, QuicklineUSA / Boels, Inc., which operated as "Ultra Marine West." On this account, Boyut decided to begin rebranding to "ULTRA MARINE" in 2013.

Radek Mašín — then only a prospective European distributor — initiated discussions with Defendant at that time to enter into a distribution agreement for Ultra Marine products. During these early discussions, he arranged for the stylized logo to be designed in Prague "as a gift to Boyut," incorporating wording and an anchor-like "M" that Boyut had specified. Boyut approved the logo on July 15, 2013, applied to register it in Turkey on July 22, 2013, and used it in commerce thereafter. But Boyut owned the trademark and used it in commerce to market its marine products.

Plaintiff paints a different story. Plaintiff contends that it created and owns both the ULTRA MARINE mark and the stylized logo (designed in Prague in 2014 and assigned up a corporate chain to Plaintiff). Plaintiff insists that Boyut was merely its contract manufacturer, and that Defendant has no United States rights of its own. Plaintiff holds the only currently live U.S. registration for the mark (Reg. No. 8,007,424), which claims a priority date of March 23, 2023, based on a Czech application. The complaint dates its first U.S. use to 2015.

One fact is undisputed. Boyut is the manufacturer of the products relevant to this case. Plaintiff markets and distributes those products. The Agreement says so in its own recitals: Boyut "is engaged in the business of manufacturing metallic ship and boat propellers and their accessories, anchors, grapples, etc.," and Plaintiff "desires to retain the Company to manufacture and supply" the Products. Distribution Agreement, Recitals A–B. [D.E. 6-1 at 37]. Plaintiff filed it as part of Exhibit 1 to its own motion. [D.E. 6]. Four of the Agreement's provisions matter are particularly relevant.

Territory and exclusivity. "Territory" is defined as "Seychelles, Mauritius and all countries located in the European continent, excluding Turkey, but including also United Kingdom (with its offshore islands and the Republic of Ireland), Sweden, Norway, Denmark, Finland, Estonia, Latvia and Lithuania." [D.E. 6-1 § 1]. Section 2.1 grants Plaintiff "the exclusive right (even as against the Company) to sell, use, and offer for sale or otherwise commercialize the Products in the Territory," and then imposes a corresponding limit: "The Distributor shall not sell or otherwise commercialize the Products outside of the Territory." [*Id.* § 2.1]. The United States appears nowhere in the definition, and the Agreement's one concrete list of countries, the design-registration obligation at Section 11.3, is entirely European.

Intellectual property. Section 9.1 provides that "neither Party shall obtain any rights to the existing Intellectual Property Rights of the other Party solely by reason of entering into this Agreement." Section 9.4 grants Plaintiff "the non-exclusive right during the term of this Agreement to use the Intellectual Property Rights owned by

the Company and to register and protect such rights on the Company's behalf for the purpose of promoting, marketing and selling the Products in the Territory." It continues: "The Distributor acknowledges that, except for the limited license rights granted in this Section, it shall not acquire any rights in respect of any such Intellectual Property Rights and that all such rights and goodwill are, and shall remain, vested exclusively in the Company and/or its affiliates." [*Id.* § 9.4].

Trademarks and the logo. Section 9.7 provides that the parties "shall jointly select in good faith the trademarks to be used for the marketing and sale of the Products in the Territory," and that "if a new trademark is developed in the Territory to be used for the marketing and sale of the Products in the Territory, it shall become and remain the property of the Distributor." Section 9.8, a provision both sides press, reads in relevant part: "The Company acknowledges that the Distributor (i) has created the logo and design attached to this Agreement under Exhibit C ('Logo and Design'), (ii) is the legal and valid owner of the Intellectual Property Rights over the Logo and Design; and (iii) has granted the usage rights of the Logo and Design to the Company for the duration of the Agreement." It gives Boyut a right of first offer to purchase the Logo and Design on termination. And it closes with a key sentence: "The Distributor acknowledges that the Company is the legal and valid owner of the Intellectual Property Rights over the name 'Ultra' and its other versions rather than 'UltraMarine.'" [*Id.* § 9.8].

Governing law and Exhibit C. Section 18 provides that "[t]he validity and interpretation of this Agreement and the legal relations of the Parties hereto shall be

governed by Turkish laws." [*Id.* § 18]. No party has briefed Turkish law. And the "Logo and Design" that Section 9.8 assigns to Plaintiff is defined by reference to an Exhibit C that is attached thereto.

### *B. The Registrations and the Termination of the Agreement*

There is substantial evidence in the record of Defendant's early use of the mark at issue. Defendant's predecessor Boels filed a "ULTRA MARINE WEST" registration that issued May 17, 2016, on a specimen displaying the very stylized logo now in suit. That registration was cancelled December 2, 2022, for failure to maintain it. Boyut acquired Boels in December 2015. Defendant also points to a 2022 invoice it sent to Mašín bearing the mark, well as hearing testimony that Mašín visited Defendant's Fort Lauderdale premises in or about 2020, and also to 2016 correspondence in which Boyut required Plaintiff to drop "ULTRA MARINE by Radek Masin" and not to hold itself out as the brand's founder.

The parties performed under the distribution agreement until a falling out in 2025. Boyut issued a suspension and cure notice on February 27, 2026, and terminated the Distribution Agreement for cause on March 18, 2026. The termination notice cites a €965,686.50 payment default; as well as "the use of the Client Company's trademarks in a manner capable of creating confusion in the market as to the source or manufacturer of the products"; "promotional activities positioning yourself as a manufacturer and/or designer rather than a distributor"; and, as an independent ground, Plaintiff's filing of trademark applications in the European Union and the United States, including USPTO Nos. 99550223 and 99617806,

"during the continuation of the distributorship relationship." Notice of Termination ¶¶ 3, 5-6 (Mar. 18, 2026).

Plaintiff filed this action on March 23, 2026, and sent Boyut a Turkish-language rejection-and-ownership notice on March 24, 2026. The motion now before the Court followed.

## *II. GOVERNING PRINCIPLES*

A movant seeking a preliminary injunction must establish four elements: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs the harm the injunction would inflict on the non-movant; and (4) that the injunction would not be adverse to the public interest. *E.g., Wreal, LLC v. Amazon.com, Inc.,* 840 F.3d 1244, 1247 (11th Cir. 2016) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Because a preliminary injunction is an "extraordinary and drastic remedy" the burden of persuasion on all four elements rests with the movant, and the failure to carry it on any one of them defeats the motion. *Wreal,* 840 F.3d at 1247 (citing also *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998)).

Two features of that standard control this case. First, if the movant cannot show a substantial likelihood of prevailing, the Court need go no further, for the remaining factors cannot overcome an uncertain outcome on the merits. Second, a preliminary injunction does not exist to resolve hard, fact-intensive disputes on a truncated record. It seeks to preserve the status quo where the movant's right is clear

and the harm of waiting is real. *See, e.g., Gray Line Motor Tours, Inc. v. City of New Orleans*, 498 F.2d 293, 296 (5th Cir. 1974) ("the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief").

The standard is thus more demanding than those governing other stages of the same case. Hence a claim that survives a pleading motion, or that would present a jury question at trial, does not for that reason justify interim relief. *Cf. I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, 500 F. Supp. 3d 380, 405-06 (E.D. Pa. 2020) (observing that "the pleading standards to allege fraud are more forgiving the[n] those required to support a preliminary injunction," and allowing under Rule 9(b) the same allegations the court had rejected at the preliminary-injunction stage for want of clear and convincing evidence).

With respect to the Agreement's choice of law, it has no bearing for now. Section 18 makes Turkish law govern the Agreement's "validity and interpretation." Neither party has offered Turkish authority, expert declaration, or translated statutory material. Federal Rule of Civil Procedure 44.1 permits the Court to consider "any relevant material or source" in determining foreign law, but it does not permit the Court to invent one. For purposes of this motion only, the Court reads the Agreement's English text as written and confines itself to provisions whose meaning does not appear to turn on any contested rule of Turkish construction. Nothing here

forecloses a different construction once Turkish law is properly presented, and the parties should be prepared to address at later stages of the case both the content of Turkish law and the consequence of a failure to prove it. Defendant, for its part, now suggests that the Court "need not address" the Agreement's post-termination status at all and "may leave this for a Turkish court to decide" if Plaintiff's delay alone warrants denial. [D.E. 46 at 8]. The Court agrees that delay is an independent and sufficient ground, *see* Part III.B, *infra*, but it does not accept the invitation to say nothing about the Agreement. The Agreement is the source of the rights Plaintiff asserts, both sides rely on it, and the likelihood-of-success inquiry cannot be conducted without it.

## *III. ANALYSIS*

Plaintiff's motion is predicated on what it must ultimately prove: that it is the senior user of the mark in the United States, that it owns the copyrighted logo, and that the distribution agreement supports Plaintiff's reading and sustains its theory of infringement. That is a burden that is too heavy to bear on this limited record.

### ***A. No Substantial Likelihood of Success Has Been Shown in This Manufacturer-Distributor Dispute***

Trademark rights turn on priority of use. "Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1080–81 (11th Cir. 2016) (quoting *Hana Financial, Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015)); *see, e.g., Vital Pharmaceuticals, Inc. v. Monster Energy Co.*, 472 F. Supp. 3d 1237, 1261 (S.D. Fla. 2020) (holding that party

with prior use had superiority over registered trademark holder) (citing *Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 558 (E.D.N.Y. 2017) (recognizing that first use is "sufficient to overcome the presumption of validity created by the plaintiff's registration of the trademark")).

Priority is also territorial, as the Eleventh Circuit explained in an analogous trademark dispute between a foreign manufacturer and distributor: "Our concern must be the business and goodwill attached to United States trademarks, not French trademark rights under French law." *E. Remy Martin & Co. v. Shaw-Ross International Imports, Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985); *see also International Cosmetics Exchange, Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1248 n.3 (11th Cir. 2002) ("territoriality doctrine" adopted by *E. Remy* means that a trademark has a separate existence in each sovereign territory in which it is registered or legally recognized).

District courts in this Circuit have routinely applied the same rule: "a party's first use of a mark outside the United States doesn't establish any trademark rights within the United States." *Shenzhen Kinwong Electronic Co. v. Kukreja*, 574 F. Supp. 3d 1191, 1217 (S.D. Fla. 2021) (collecting authority); *see also Cotton Ginny, Ltd. v. Cotton Gin, Inc.*, 691 F. Supp. 1347, 1352 (S.D. Fla. 1988) ("[A] trademark is acquired only within those markets where the mark has been used and its meaning become known.").

### *1. The Distribution Agreement Cuts Both Ways*

When first use occurs inside a manufacturer-distributor relationship, a further question arises: to whom is that use attributed? Judge Altman's decision in *Shenzhen Kinwong* supplies the answer that other district courts in our Circuit have also applied. Courts "look first to any agreement between the parties regarding trademark rights," and contractual provisions on trademark ownership are treated as "determinative." 574 F. Supp. 3d at 1217-18 (quoting *Sengoku Works Ltd. v. RMC International, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996); *Premier Dental Prods. Co. v. Darby Dental Supply Co., Inc.*, 794 F.2d 850, 854 (3d Cir. 1986); and 2 *McCarthy on Trademarks and Unfair Competition* § 16:48). Absent an agreement, courts "presum[e] that a foreign manufacturer owns the trademarks of its products." *Id.* at 1218 (quoting *Rigoni USA, Inc. v. Rigoni di Asiago USA, LLC*, 2009 WL 10667806, at *10 (S.D. Fla. Jan. 14, 2009)); *see also TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 882 (7th Cir. 1997).

And, notably, that presumption is irrebuttable as to a non-exclusive distributor, and rebuttable by an exclusive distributor only on a six-factor showing. *Shenzhen,* 574 F. Supp. 3d at 1218–19 (citing *Covertech Fabricating, Inc. v. TVM Bldg. Products, Inc.*, 855 F.3d 163, 171 (3d Cir. 2017)). The Court notes that no decision of the Eleventh Circuit or the Supreme Court mandates this framework. *See Open Sea Distribution Corp. v. Artemis Distrib., LLC*, 692 F. Supp. 3d 1151, 1189 (M.D. Fla. 2023) (observing that "no case from the Eleventh Circuit or Supreme Court mandates using the framework," while noting that it "represents the majority if not

unanimous view"). The Court applies it as strong persuasive authority in our District, and also because both parties' arguments assume it.

The framework matters because it reverses the intuition on which Plaintiff's motion rests. Plaintiff presents itself as the brand's originator and Boyut as its contract manufacturer. The Agreement describes the opposite arrangement. Boyut manufactures; Plaintiff resells in Europe. *Only* in Europe. In that posture, the starting presumption favors the manufacturer, and the question becomes whether the parties contracted around it.

Plaintiff's answer to all of this is that it, not Boyut, occupies the manufacturer's position in the framework: physical fabrication is immaterial and that a party who designs a product and hires a factory to build it to specification is the "manufacturer" for these purposes. The argument is not without some support. *See Open Sea*, 692 F. Supp. 3d at 1191-92.

But it is beside the point here, because the presumption it seeks to capture is a gap-filler. As the court explained in *I.M. Wilson*, a party invoking *Covertech* for "the rebuttable presumption that the manufacturer retains the initial trademark ownership in an infringement dispute between a manufacturer and distributor" must reckon with the fact that "this presumption only applies where there is no agreement between the parties setting out the trademark ownership." 500 F. Supp. 3d at 404. But where the parties have addressed the issue in a contract, "the analysis in *Covertech* is inapplicable." *Ibid.* And the cases on which Plaintiff would rely bear this

out: *Open Sea* applied the presumption expressly because "no agreement governs trademark rights." 692 F. Supp. 3d at 1192.

The participants in this arrangement *did* contract about trademark ownership – for the Territory. As to the Territory, the presumption and its rebuttal factors drop out, and Sections 9.4, 9.7, and 9.8 govern. As to the United States, the parties to the Agreement made no allocation at all. They said only that Plaintiff could not operate there. A contract that allocates European rights displaces the default for Europe; it does not displace the default for a market it never reaches. In that unallocated space the ordinary presumption remains available, and here it favors the manufacturer.

Indeed, every intellectual-property grant in Section 9 is bounded by the Territory the parties contemplated. Section 9.4 licenses Plaintiff to use and register Boyut's intellectual property "for the purpose of promoting, marketing and selling the Products in the Territory" and to do so "on the Company's behalf." Section 9.7 vests in Plaintiff only a trademark "developed in the Territory to be used for the marketing and sale of the Products in the Territory." Section 9.6 gives Plaintiff enforcement discretion "anywhere in the Territory." And a fair and more persuasive reading of Section 2.1 makes the boundary explicit in both directions: Plaintiff receives exclusivity inside the Territory and is forbidden to commercialize outside it.

Reading a distributorship agreement to allocate trademark rights by sales territory is not exactly novel. It is what the Tenth Circuit did in *Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117 (10th Cir. 2014), and the allocation there was outcome-determinative. The parties in *Derma Pen* divided the world: "The agreement

provided that Derma Pen, LLC would sell the device in the United States; 4EverYoung would sell the device throughout the rest of the world. The parties allocated trademark rights based on the sales territory; thus, Derma Pen, LLC acquired ownership of the trademark rights in the United States." *Id.* at 1118–19. In construing the agreement the court returned to the same feature: "Elsewhere, the agreement divvies up the territorial restrictions on use of the trademark: Derma Pen, LLC's territory was the United States; 4EverYoung's was the rest of the world." *Id.* at 1121. Thus, party whose territory did *not* include the United States did *not* own the mark in the United States.

The allocation here runs the other way. Plaintiff's Territory under its Agreement was Seychelles, Mauritius, and Europe excluding Turkey. The United States is not in it, and Section 2.1 forbids Plaintiff from commercializing there. Under the reasoning of *Derma Pen*, Plaintiff stands where 4EverYoung stood: outside the territory, yet purportedly asserting rights inside it. The Agreement Plaintiff entered into to get the manufacturer's business presents a clear obstacle to that effort. And the point is sharper still when this Agreement is set beside the one in *Shenzhen*. The distributor there held a contractual territory that expressly included the United States, sold the manufacturer's goods here under the mark for years, and still did not own the United States mark, because the agreement reserved nothing to it and the manufacturer's presumption still governed. 574 F. Supp. 3d at 1226-27; *Shenzhen Kinwong Elec. Co. v. Kukreja*, 778 F. Supp. 3d 1255, 1262 n.5, 1288-90 (S.D. Fla. 2025)

(judgment after bench trial). Plaintiff's Territory does not include the United States at all.

The two contracts also differ on the point that decided *Derma Pen*. There, "[w]ith ownership of the U.S. trademark rights, Derma Pen, LLC promised to register the 'DermaPen' trademark with the United States Patent and Trademark Office," *id.* at 1119, and the agreement recited that the U.S. party acted "[w]hile not relinquishing any of its U.S. trademark rights," *id.* at 1122 n.3. Section 9.4 of *this* Agreement provides the opposite on each point: Plaintiff's authority to "register and protect" is exercised "on the Company's behalf," Plaintiff "shall not acquire any rights," and all goodwill "shall remain[] vested exclusively in the Company."

These differences matter. The Agreement does not grant Plaintiff United States rights. It does not purport to. Where the Agreement is silent (and as to the United States it is silent) except to place that market off-limits to Plaintiff, the manufacturer presumption would apply in Boyut's favor, not Plaintiff's. *Shenzhen Kinwong*, 574 F. Supp. 3d at 1218.

Nor does a European allocation carry United States rights with it. Goodwill in this country attaches to United States trademark rights and exists separately from whatever rights exist abroad; it is separately owned and separately assignable. See 5 *McCarthy on Trademarks and Unfair Competition* § 29:8 (5th ed. 2026); *E. Remy Martin*, 756 F.2d at 1531. That is why the question the Agreement addresses, as to who may sell under the mark in Europe, does not answer the question this case presents.

Section 9.4 does more than fail to help Plaintiff; it affirmatively cuts against Plaintiff's registration theory. A strong case can be made that Plaintiff's authority to "register and protect" marks was authority exercised "on the Company's behalf," coupled with an express acknowledgment that Plaintiff "shall not acquire any rights" and that "all such rights and goodwill are, and shall remain, vested exclusively in the Company." A distributor that registers a mark under a clause like that does not thereby become its owner. Whether that provision reaches Plaintiff's 2023 U.S. registration, obtained for a market outside its contractually-sanctioned Territory, is a question that will be litigated intensely. But Plaintiff cannot invoke the Agreement as the source of its rights while ignoring the sentence in which it disclaimed them. Once again, a fair reading of the Agreement that created the parties' relationship therefore does not support a finding of *substantial* likelihood of success in Plaintiff's favor.

Plaintiff accuses Defendant of wielding the Agreement as both sword and shield: Boyut's termination notice treats Plaintiff's United States trademark filings as a breach of the Agreement, yet Defendant tells this Court that the Agreement has nothing to say about United States rights. [D.E. 42 at 10-11]. Maybe so, but this charge of inconsistency does not go far. The two positions are reconcilable, and Defendant's sur-response reconciles them: the Agreement confines Plaintiff's license, and its authority to register marks, to the Territory, so a registration sought elsewhere, in Plaintiff's own name, could be treated by Boyut as a breach of Sections 2.1 and 9.4 without the Agreement thereby allocating ownership of a market it never

addressed. [D.E. 46 at 7-8]. Plaintiff relies on the point that a contract can forbid a party to act in a place without dividing the rights that exist there. And indeed that is what a territorial restriction does.

Plaintiff's retort to this is subtler. The Boyut's termination notice cited two of Plaintiff's United States applications (directed, Plaintiff says, to "Ultra Anchor" marks) as a breach, but said nothing about Plaintiff's United States application for ULTRA MARINE. That silence shows, Plaintiff reasons, that Boyut then understood ULTRA MARINE to be Plaintiff's. [D.E. 42 at 11 n.11]. That is a plausible inference from silence, and a factfinder may draw it. But it is an inference, drawn from an after-the-fact letter, and it competes with the same notice's complaint that Plaintiff was using "the Client Company's trademarks in a manner capable of creating confusion in the market as to the source or manufacturer of the products." Notice of Termination ¶ 5. A movant's burden is not carried by the more favorable of two inferences that can be drawn from the same communication.

Plaintiff also argues that a European territorial limit says nothing about who owns a mark in America, and that United States rights are governed by United States use, not by a Czech-Turkish contract. That is a fair point and true as far as it goes. But it too is a double-edged proposition. If the Agreement does not control United States rights, then Plaintiff must establish those rights the ordinary way through first use in United States commerce. But as we address next, that showing runs the other way in this limited record.

### *2. Priority of Use in the U.S. is Hotly Disputed*

"Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *Hana Fin.,* 574 U.S. at 419; *see, e.g., Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1193 (11th Cir. 2001) (explaining that, under the common law, a party acquires trademark ownership only through actual prior use of the mark in commerce); *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1141 n.5 (11th Cir. 2018) (same).

"[T]he use of a mark in commerce . . . must be sufficient to establish ownership rights for a plaintiff to recover against subsequent users under [S]ection 43(a)." *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1321 (11th Cir. 2011) (quoting *Planetary Motion*, 261 F.3d at 1193-94). A two-part test is utilized to determine whether a party has proved "prior use" of a mark sufficient to establish ownership: a party must submit (1) evidence showing adoption, and (2) "use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Ibid.* (quoting *Planetary Motion*, 261 F.3d at 1195). This determination is to be made on a case-by-case basis, considering the "totality of the circumstances," including, among other things, sales, advertisements, and distribution of goods. *Planetary Motion,* 261 F.3d at 1195 (citing *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 433 (7th Cir.1999)).

Because the Agreement here does not allocate United States rights, those rights turn on use in commerce in the United States. Plaintiff's own pleading dates Plaintiff's first U.S. use to 2015 and rests its registration on a claimed priority date of March 23, 2023. Yet, Defendant's evidence, which is supported by a strong factual showing that the Court finds credible, reaches back nearly a decade earlier: a distributor of Boyut used the ULTRA-brand use in U.S. commerce from 2006, through QuicklineUSA / Boels, ULTRA MARINE was then used from 2013, and a Boyut-affiliated U.S. registration was in effect from 2016 to 2022 resting on basically the same stylized logo Plaintiff now claims. So the evidence in this limited record shows both adoption of the mark and sufficient use in commerce by the purchasing public that ties the mark to Boyut's U.S. distributor. Defendant has the better of this record. *See, e.g., USA Nutraceuticals Group, Inc. v. BPI Sports, LLC*, 165 F. Supp. 3d 1256, 1265 (S.D. Fla. 2016) (applying totality test and denying motion for preliminary injunction filed by junior user of common law mark based on evidence showing use of the mark through the Internet and print media targeting the public associated with the mark).

Thus, party whose first use postdates its adversary's by years is, on the face of it, the junior user, and the junior user is *not* entitled to enjoin the senior. *See, e.g., Domond v. PeopleNetwork APS*, 748 F. App'x 261, 263 (11th Cir. 2018) (affirming dismissal of trademark infringement complaint where complaint conceded that others used the marks well before the plaintiff's alleged use in commerce); *Edge Sys. LLC v. Aguila*, 186 F. Supp. 3d 1330, 1345 (S.D. Fla. 2016), *aff'd,* 708 F. App;x 998

(Fed. Cir. 2017) (granting summary judgment on trademark claim where manufacturer acquired common law trademark rights to the trade name and as prior user of distinctive marks; manufacturer's prior use of the marks and logo predated plaintiff's registered use of the marks).

Plaintiff resists that chronology on two fronts. First, Plaintiff says that the ULTRA anchor brand of 2006 is not the ULTRA MARINE mark of 2013, that "Ultra" standing alone is a weak term that coexists with many other "Ultra" marks, and that Defendant can claim no priority in ULTRA MARINE from its use of something else. [D.E. 42 at 10 n.10]. It is true that a party may "clothe a new mark with the priority position of an older mark" only when the two are "legal equivalents" that "create the same, continuing commercial impression," and whether that is so is a question of fact. But that fact is one the Supreme Court has assigned to the trier of fact. *Hana Fin.*, 574 U.S. at 419-20, 422-23. Whether ULTRA MARINE tacks onto ULTRA is therefore not a question the Court can answer on this limited record on a motion for preliminary injunction.

In any event this point is not as helpful to Plaintiff as it makes it out to be. If Defendant cannot tack, then priority in ULTRA MARINE turns on the competing accounts of 2013 through 2015, and those accounts are in direct conflict. Defendant places the stylized logo in United States commerce from July 2013 through Boels and points to a 2015 application alleging a first-use date in July 2014. [D.E. 46 at 3 (citing Y. Decl. ¶¶ 26, 28)]. Plaintiff dismisses the 2013 uses as internal e-mails, treats the 2015 application as establishing nothing earlier than its filing date, and dates its own

first American use to January 2015. [D.E. 42 at 9-10]. A movant whose claim to seniority depends on winning a swearing contest over events a decade old, on declarations and a day of testimony, has not shown a substantial likelihood of success. And if Defendant can tack this way, Plaintiff's 2015 date is nearly a decade late. Either way, the Court cannot find Plaintiff likely to prevail on priority. At best, it presents a thorny factual question that the trier of fact will have to unwind. But that is not something we can easily do on a motion for preliminary injunction. Plaintiff's showing of substantial likelihood of success is weakened further still on this basis.

Second, Plaintiff contends that its own use in United States commerce began no later than January 2015, when it displayed the mark at the Cannes boat show and began selling marked products to European boat builders whose vessels reached American purchasers through their United States distribution networks. [D.E. 42 at 9-10]. Plaintiff invokes *Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412 (2023), for the proposition that "use in commerce" can be domestic without a domestic physical presence, and a Fourth Circuit decision holding that casino services rendered in Monaco to American patrons satisfied the Lanham Act. *International Bancorp, LLC v. Société des Bains de Mer et du Cercle des Étrangers à Monaco*, 329 F.3d 359, 370 (4th Cir. 2003). Defendant replies that Plaintiff's activities occurred entirely abroad, that a foreign trade show is not a sale of marked goods in United States commerce, and that *International Bancorp* is an out-of-circuit decision about services that this Circuit has not extended to goods. [D.E. 46 at 8-9].

The Court need not choose between these positions to decide this motion, and it does not. But once again the governing standard shows why the dispute cannot be resolved in Plaintiff's favor now. Ownership through use requires "actual prior use in commerce," assessed on "the totality of the circumstances," and the question is whether the use was "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Direct Niche, LLC v. Via Varejo S/A*, 898 F.3d 1144, 1149-50 (11th Cir. 2018) (quoting *Planetary Motion*, 261 F.3d at 1195). "The typical evidence of use in commerce is the sale of goods bearing the mark"; advertising, publicity, and solicitation can suffice in the absence of sales; "secret or de minimis uses" cannot. *Id.* at 1150 (quoting *FN Herstal*, 838 F.3d at 1081). For goods, the statute contemplates a mark placed on the product and the product "sold or transported in commerce." 15 U.S.C. § 1127; *Geovision, Inc. v. Geovision Corp.*, 928 F.2d 387, 389 (11th Cir. 1991).

Applying these principles, two things follow. Plaintiff is right that the inquiry does not demand a physical American presence; the Eleventh Circuit for instance has found sufficient use by a Brazilian retailer that operated no stores and shipped no goods here, but sold advertising services to American companies on a website visited by millions of American users. *Direct Niche*, 898 F.3d at 1146-47, 1150-51. But Plaintiff is wrong to suppose that the question answers itself. Whether a display at a French boat show, and sales to European builders who later sold boats to Americans, made ULTRA MARINE known to an appropriate segment of the American public as

*Plaintiff's* mark is a question of fact on which Plaintiff bears the burden, and on which the record now consists of Mr. Mašín's less-than-credible testimony and little else.

As for *Abitron*, it addressed the extraterritorial reach of the Lanham Act's infringement provisions, and the Eleventh Circuit has been explicit that the jurisdictional and ownership inquiries, though both framed in terms of "use in commerce," are distinct. *Direct Niche*, 898 F.3d at 1150 (citing *Planetary Motion*, 261 F.3d at 1194–95 & n.8). *Abitron* does not tell a court who used a mark first. Indeed, Judge Altman reached the same conclusion in applying *Abitron* after trial in *Shenzhen*: the majority "expressly dodged any attempt to define 'use in commerce' beyond 'the bona fide use of a mark in the ordinary course of trade,'" and the definition it construed is the one that "defines the kind of 'use' needed to acquire registerable trademark rights—not to infringe them." 778 F. Supp. 3d at 1306 & n.38 (quoting *Abitron*, 600 U.S. at 428 & n.6, and *Axiom Worldwide, Inc. v. NAM Medical Corp.*, 522 F.3d 1211, 1220 n.7 (11th Cir. 2008)). *Abitron* located infringing conduct; it did not allocate ownership, so its value to the question presented here is negligible.

The Court accepts that "a distributor may own the trademark in goods it does not manufacture." *I.M. Wilson*, 397 F. Supp. 3d at 736 ¶ 62 (quoting *Premier Dental*, 794 F.2d at 853). Nothing in the manufacturer-distributor framework says otherwise. The question is not whether a distributor may own a mark. It is whether on this record this distributor without question owns this mark in this country, and on that question the Agreement puts the country outside Plaintiff's Territory and the record puts Defendant's asserted use years ahead of Plaintiff's. Even in the light most

favorable to Plaintiff, this first use may be deemed too tangential or irrelevant to cut against Plaintiff's 2023 registration. But that is after a fulsome review of a complete record after discovery. Hence, even if it may have merit, this argument cannot possibly succeed on this limited record on Plaintiff's motion for preliminary injunction.

Indeed, at this stage it appears Defendant has the stronger argument on this point, but we need not make an ultimate conclusion on this score other than acknowledge that Plaintiff cannot possibly satisfy its burden of showing a likelihood of success. The categories of evidence Defendant offers for the years before Plaintiff appeared are the categories courts have often found sufficient to establish senior common-law rights. For instance, in *Watec Co. v. Liu*, 403 F.3d 645 (9th Cir. 2005), a Japanese manufacturer defeated its former exclusive United States distributor's registrations on proof of pre-distributorship activity consisting of "thousands of direct mail solicitations and sample cameras bearing WATEC and WAT marks to potential American customers," attendance at "national trade shows where they displayed cameras bearing the WATEC and WAT marks," and evidence "that American customers and potential customers placed orders and requested price quotes." *Id.* at 648, 653-54.

Here Defendant's asserted 2006-2013 record is of the same character: ULTRA-branded anchors moving into United States commerce through a United States distributor, trade-show presence, and a United States registration resting on a very similar stylized logo. And, though the anchors reached this country through a United

States distributor rather than directly from the Turkish factory, the point still stands. In the global marketplace "it's not uncommon for businesses to use distributors to access foreign markets," and "our trademark law allows a manufacturer to avail itself of its distributors' U.S. business." *Shenzhen Kinwong*, 574 F. Supp. 3d at 1221 n.22; *see id.* at 1238–39 (rejecting any "direct-versus-indirect-sales distinction"). Again, Judge Altman's reasoning in *Shenzhen* is apt. The manufacturer there sold into the United States through a Hong Kong affiliate, through a Hong Kong trading company, through a U.S. sales agent, and through a Wisconsin sales representative. So the distributor argued that indirect sales through intermediaries were not the manufacturer's use. Judge Altman rejected that argument on the ground that no case supports a "direct-versus-indirect-sales distinction," that the manufacturer in other cases like the Third Circuit in *Sengoku* likewise sold products to an independent trading company and then distributors, and that "our trademark law allows a manufacturer to avail itself of its distributors' U.S. business." 574 F. Supp. 3d at 1221 n.22, 1238-39 (citing *Sengoku,* 96 F.3d at 1218-19).

The same analysis applies here. And so too does *Watec* as to a second question the Court does not decide but should acknowledge. Whether Plaintiff's own asserted United States activity, if any, inured to Plaintiff *or to Boyut* turns on whether that use was controlled by Boyut under 15 U.S.C. § 1055 and the "related company" definition of 15 U.S.C. § 1127. In *Watec* the manufacturer established "continuous use" across a gap in its own distribution arrangements "based on Watec America and Liu's use because Watec America and Liu were using the marks as Watec Japan's

licensees during that time period." 403 F.3d at 654; *accord I.M. Wilson*, 500 F. Supp. 3d at 405. Section 9.4 of this Agreement, which makes Plaintiff's registration authority exercisable "on the Company's behalf" and vests all goodwill in Boyut, thus supports *Defendant's* argument that any registration inured to Boyut's benefit. *See, e.g., Shenzhen*, 574 F. Supp. 3d at 1223-24 (distributor's use attributed to manufacturer where the agreement required the distributor to "conduct all of its business in its own name").

Again, no ultimate finding need be made on this point. But it only highlights how Plaintiff cannot meet its burden to obtain preliminary injunctive relief.

Finally, as if that were not enough, if Plaintiff did commercialize in the United States beginning in 2015, it did so in the teeth of Section 2.1, which arguably forbade exactly that. Use that breaches the distributor's own contract is an unpromising foundation for priority. A United States registration obtained in the name of a distributor where the manufacturer owns the mark is "invalid and void ab initio." 5 *McCarthy* § 29:8. And a court in this district has recently held that a distributor's registrations did not defeat a manufacturer's prior rights in part on that basis. *Frumar Agri Foods (P) Ltd. v. RRK Foods Inc.*, 2025 WL 2408431 (S.D. Fla. Aug. 18, 2025). Plus, *Watec* is to the same effect on stronger facts: the distributor's registrations there had become incontestable under 15 U.S.C. § 1065, and the manufacturer prevailed anyway. Plaintiff's 2023 registration carries no comparable protection.

In any event, this too is an issue that will be developed further in the litigation. It does not help Plaintiff now, even though Plaintiff resorts to the argument that its live registration is prima facie evidence of validity and ownership, and that Defendant's contrary account rests on nothing but untested declarations. The premise is correct. Registration does put a thumb on the scale. *See* 15 U.S.C. § 1057(b). But it is a thumb, not an anvil. The statute makes the presumption rebuttable in terms, and it speaks to validity and ownership, not to the date of first use by a rival claiming decades of prior commerce. The Lanham Act says as much itself. The constructive-use priority that a registration confers runs "against any other person *except* for a person whose mark has not been abandoned and who, prior to such filing—(1) has used the mark[.]" *Id.* § 1057(c) (emphasis added). And because Plaintiff's registration is not incontestable, it remains subject to "any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered." *Id.* § 1115(a).

Plaintiff's registration claims priority from March 23, 2023, the date of its Czech application. *See id.* § 1126(d). Defendant's asserted use predates that date by a decade or more. And, from Plaintiff's own evidence, so does Plaintiff's. It follows, then, that a 2023 registration cannot presume away evidence that someone else was in the market in 2006, or in 2013. Further support for this conclusion is found from the Eleventh Circuit's long-established recognition that "a registered mark has prima facie validity but is subject to another's bona fide use of the same or similar mark under the common law." *Tally-Ho, Inc. v. Coast Cmty. College District*, 889 F.2d 1018,

1023 (11th Cir. 1989); *see also Shenzhen*, 574 F. Supp. 3d at 1237 (registrant's presumption "is rebutted . . . where there is evidence that the registrant did not own the mark at the time of registration," so that "[p]roof of prior ownership . . . trumps registration") (quoting *Rigoni*, 2009 WL 10667806, at *10); *see also Union National Bank of Texas, Laredo v. Union National Bank of Texas, Austin,* 909 F.2d 839, 842 (5th Cir. 1990) ("Ownership of trademarks is established by use, not by registration.").

We acknowledge that Defendant's showing is not free of difficulty either. Its seniority depends in part on a series of transactions that have not been fully supported with compelling documentation. Defendant's answer is that its rights come from Boyut and that the succession is a matter of corporate record easily supplied. Plaintiff's counters that a distributor cannot borrow a manufacturer's presumption on the strength of a declaration. Whether Defendant's account of that succession is documented, contradicted, or merely undeveloped is a question for later development in the case. But, again, the movant's burden is to show that it is likely to win, not that the question is close. Plaintiff has not met that burden.

Finally, another hotly disputed issue will be what to make of Section 9.8 of the parties' Agreement. On its face it is a signed, contemporaneous acknowledgment by the manufacturer that the distributor created and owns the logo. That is tangible evidence in Plaintiff's favor. Section 9.8 gives Boyut a "right of first offer to purchase" the Logo and Design on termination, and the *Derma Pen* court drew from a materially similar provision the inference Plaintiff will press here: "The distribution agreement

expressly provides that on termination, Derma Pen, LLC would offer to sell the U.S. trademark to 4EverYoung. This provision makes sense only if Derma Pen, LLC remains the owner after termination of the agreement; after all, a trademark can be sold only by the owner." 773 F.3d at 1120-21. The inference is sound and inures in Plaintiff's favor, at least at first blush.

But, in *Derma Pen*, the repurchase right attached to "the U.S. trademark" in terms. Here it attaches to "the Logo and Design" that is a defined term keyed to Exhibit C of the Agreement. The *Derma Pen* inference, however, says nothing about the word mark, and nothing about the ULTRA family, which the same sentence assigns to Boyut. That distinction may prove quite consequential.

Beyond that, four features limit what Section 9.8 can do on this motion. First, the same sentence that gives Plaintiff the logo gives Boyut control over the intellectual property. Section 9.8 closes with Plaintiff's acknowledgment "that the Company is the legal and valid owner of the Intellectual Property Rights over the name 'Ultra' and its other versions rather than 'UltraMarine.'" Whatever else that sentence does, it concedes Boyut's ownership of the ULTRA family. In the face of this, Plaintiff's still motion asks this Court to enjoin "any 'Ultra'-branded" logo. Plaintiff has contracted away the premise of that request. At minimum, the parties' agreed-upon limitation cuts strongly against Plaintiff's showing of likelihood of success that is premised on this section.

Second, the carve-out for "UltraMarine" is material; the clause says Boyut owns "Ultra" and its versions other than "UltraMarine." Plaintiff may well have the

better reading of the effect of this clause, because an exclusion drafted into a provision otherwise allocating ownership invites the inference that the excluded item belongs to the other side. Plaintiff adds to this that Mr. Yücel testified the closing sentence was added precisely to make clear that Boyut's other "Ultra" marks, unlike ULTRA MARINE, were not Plaintiff's. [D.E. 42 at 8]. Defendant's sur-response does not really quarrel with that reading; it describes Section 9.8 as recognizing "Boyut's ownership of the ULTRA marks, as distinct from ULTRA MARINE, *in Europe*." [D.E. 46 at 3]. So the disagreement has narrowed to a single qualifier – "in Europe" – and it is the qualifier the Court has already drawn from the Agreement's structure. Section 9.8 is good evidence that ULTRA MARINE was Plaintiff's in the Territory. Whether it reaches the United States is the question, but this clause does not answer it.

Third, the clause suffers from an ambiguity that cuts against its reliability. To illustrate, in *I.M. Wilson*, a United States distributor claimed ownership of a Russian manufacturer's house mark on the strength of a two-line 1992 writing which said, in terms, that the distributor owned the mark and its goodwill. The court found a "latent structural ambiguity" in the agreement and declined to resolve ownership on the papers because: "there is the obvious issue of extraordinary brevity. The Court would not ordinarily expect an agreement irrevocably transferring the ownership of a valuable mark — particularly one's own surname — to be concluded in two lines of text"; "the writing is silent on the issue of consideration"; and "certain collateral circumstances create ambiguity[.] Notably, I.M. Wilson drafted the document and presented it to Mr. Grishko in English — not his native language." 500 F. Supp. 3d

at 401. Because "[c]ontract disputes which are not resolved as a matter of law require discovery into course of dealing and performance, trade usage, and the parties' expectations at a minimum," the court held it "not appropriate to resolve the scope of the agreement now before fact discovery and the consideration of extrinsic evidence." *Id.* at 402–03.

Each of those features is present here, with one addition. Section 9.8 is a single sentence embedded in a commercial distribution agreement. It recites no consideration for the acknowledgment. It was drafted in English and executed by Boyut's Turkish executive. The Court need not find that Section 9.8 fails; it holds only that a clause with these features presents an interpretive question of the sort resolved after discovery and extrinsic evidence, not on a preliminary-injunction record. That conclusion does not depend on any contested rule of Turkish construction, and it would survive whatever Turkish law is ultimately shown to provide.

Fourth, and most fundamentally, Section 9.8 binds Boyut. Boyut is not a party to this case. Defendant Ultra Marine West is a separate Florida corporation, and its relationship to Boyut — the acquisition of Boels in December 2015, the succession to whatever United States rights Boels held — is asserted in the Yücel Declaration and not yet established. A contractual acknowledgment is powerful against the party who made it. Plaintiff has sued someone else.

Finally, Plaintiff invokes the Trademark Manual of Examining Procedure, which recognizes that a foreign manufacturer's importer or distributor may own the United States mark where there is "a written agreement or acknowledgment . . . that

the importer or distributor is the owner of the mark in the United States." TMEP § 1201.06(a). Yet Section 9.8 is not that document. It says nothing about the United States, yet the Manual provision's operative words are "in the United States." Plus, an acknowledgment bearing the ambiguities just described is not the clear manifestation of intent that a transfer of ownership requires. The Court reserves the question whether, on a developed record and under Turkish law properly presented, Section 9.8 could be given that effect.

### *3. The Copyright Claim Requires Further Development*

Section 9.8 nevertheless improves Plaintiff's copyright position and substantially weakens one of Defendant's points on that claim. Defendant contends that Boyut is a joint author of the logo because it supplied the wording and the anchor-like "M." Boyut signed a contract acknowledging that Plaintiff "has created" the Logo and Design and "is the legal and valid owner of the Intellectual Property Rights" over it. That acknowledgment is difficult to reconcile with a claim of co-authorship, and the Court gives Defendant's joint-authorship theory correspondingly less weight. Defendant's sur-response repeats the theory and faults Plaintiff for not rebutting it. [D.E. 46 at 10–11]. But Section 9.8 is a persuasive rebuttal, at least for now.

Two problems nevertheless remain for purposes of this motion. First, chain of title. A transfer of copyright ownership is invalid unless it is in a signed writing. 17 U.S.C. § 204(a). Section 9.8 is Boyut's acknowledgment; it is not the designer's conveyance. The original designer was Dynamo, and the only assignment from

Dynamo in the record is in a foreign language with no certified English translation, and so cannot be relied upon as offered. There is, in addition, no documentary transfer from the intermediate entity, Trade Group Radek Masin, s.r.o., to Plaintiff. An acknowledgment that a party owns a work is not a substitute for the writings that would make it so, particularly where the acknowledging party never held the interest that had to be conveyed.

Second, the registration requirement. As a general matter, a copyright owner must register the work before suing. 17 U.S.C. § 411(a). Plaintiff invokes the exemption for foreign works first published abroad. But that exemption is not self-executing, and it is not enough to say that the logo is "Czech." A plaintiff invoking the foreign-work exemption bears the burden of proving that first publication occurred abroad, with specifics as to the method, extent, and purpose of that publication; a conclusory declaration will not do. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1304-05 (11th Cir. 2012); *Casa Dimitri Corp. v. Invicta Watch Co.*, 270 F. Supp. 3d 1340, 1349 (S.D. Fla. 2017). Plaintiff has not made that showing on this record. The Court notes that the burden runs against Plaintiff here; the foreign origin of the work does not relieve Plaintiff of proving the facts that trigger the exemption. Plaintiff's reply offers only the July 2013 presentation in Prague, which it says "would have been where the logo, as a work of art, was first published." [D.E. 42 at 8 n.9]. But publication is a term of art. It means "the distribution of copies . . . of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending," or an offer "to distribute copies . . . to a group of persons for purposes of further distribution,

public performance, or public display"; and "[a] public performance or display of a work does not of itself constitute publication." 17 U.S.C. § 101. A private showing of a proposed logo to one's prospective manufacturer is not obviously either, and Plaintiff has not tried to show that it is.

Defendant, for its part, suggests the opposite problem: that Mr. Yücel's testimony shows the logo was "published in the U.S. numerous times" on invoices and in e-mail signatures. [D.E. 46 at 12]. The Court does not adopt that suggestion either. Whether affixing a logo to commercial paper is "publication," and whether a work first published abroad becomes a "United States work" through later domestic publication, are questions neither side has briefed. *See* 17 U.S.C. § 101 (defining "United States work" by reference to the place of first publication). It suffices that the burden is Plaintiff's and that Plaintiff has not carried it.

#### ***4. Plaintiff's Waiver and Estoppel Theories***

Plaintiff also supports its preliminary injunction demand on the ground that Defendant relinquished its rights even over and apart from whatever section 9.8 of the distribution agreement preserved. Plaintiff points to 2025 statements by Defendant's representatives that ULTRA MARINE was "solely [Plaintiff's] now," and argues that those statements worked a waiver, an equitable estoppel, and a licensee estoppel barring Defendant from contesting Plaintiff's title. [D.E. 42 at 2–5].

Section 9.8(iii) states that Plaintiff "has granted the usage rights of the Logo and Design to the Company for the duration of the Agreement," and Section 6.2(f) requires that, on termination, Boyut "stop using any and all Intellectual Property

Rights, Confidential Information and/or know-how developed by the Distributor for and/or on behalf of the Company or which are otherwise within the scope of this Agreement, irrespective of the ownership of such Intellectual Property Rights." Section 9.8 further gives Boyut a right of first offer to purchase the Logo and Design upon termination, which is naturally a provision that presupposes Boyut retains nothing if it does not buy. On the face of the Agreement, Boyut was a licensee of the logo, and its post-termination obligation is to stop.

But the doctrine also has temporal limits that matter here. A former licensee is estopped from contesting its licensor's title on facts existing during the license, but may challenge that title on facts arising after the license ended. *See Professional Golfers Ass'n of America v. Bankers Life & Cas. Co.*, 514 F.2d 665, 671 (5th Cir. 1975). Defendant's asserted rights are said to predate the Agreement altogether.

Plaintiff may well prevail on these waiver theories – but against Boyut. Under Turkish law. Every one of these clauses is an obligation of "the Company," and the Company is not the Defendant before this Court. Plaintiff has not shown that Ultra Marine West is Boyut's alter ego, its assignee, or otherwise bound by the Agreement, and Defendant's whole position is that its United States use never depended on Plaintiff's leave in the first place. Instead, that position rested on Boyut's own senior American rights, exercised through a U.S. distributor since 2006. So Defendant persuasively argues that licensee estoppel binds a licensee; it does not bind a stranger to the license.

The waiver theory fares less well. Whatever body of law supplies the rule (the parties cite federal, Florida, and out-of-circuit authority without settling on one) the formulations converge. Waiver is the intentional relinquishment of a known right; it "requires the existence at the time of the alleged waiver of a right which may be waived, actual or constructive knowledge of that right, and the intention to relinquish that right"; and where waiver is to be implied from conduct, "the acts, conduct or circumstances relied upon to show waiver must make out a clear case." *Air Products & Chemicals, Inc. v. Louisiana Land & Exploration Co.*, 867 F.2d 1376, 1379 (11th Cir. 1989) (applying Florida law). The 2025 statements are neither a transfer of ownership nor clearly global in scope. Defendant characterizes them as limited to the European Territory and to a commercial rebrand toward "Ultra Products," and Plaintiff itself concedes that Defendant "often characterized its statements as limited to Europe." [D.E. 42 at 3 n.1]. Defendant also adds that the e-mail Plaintiff quotes for the words "solely yours now" went on to ask that Plaintiff's signature block read "Exclusive distributor of ULTRA PRODUCTS FOR MARINE *for Europe*." [D.E. 46 at 3]. That characterization has contractual support, as the Territory is where Plaintiff's rights arose and extended to. And these statements are not alone: Defendant's contemporaneous and later notices – in October 2025, December 2025, February 2026, and March 2026 – repeatedly accused Plaintiff of misusing "the Client Company's trademarks" and of breaching the Agreement. A party does not ordinarily relinquish a right one month and assert it the next.

The decisions Plaintiff collects do not bridge the gap. As Plaintiff's own parentheticals describe them, they involve a written release of "any right which we might have" under a registration, a settlement agreement, a signed letter of consent given as a condition of a loan, an instruction to a counterparty to "do whatever it wanted" with disputed goods, and a post-demand statement that no suit would be filed. [D.E. 42 at 4 n.4]. Each is an express, targeted renunciation addressed to the very right later asserted. None is a marketing announcement about a rebrand. Whether ambiguous, context-bound statements of that kind amount to a knowing waiver of senior rights in a market the statements may not even have addressed is a quintessential fact question, unfit for resolution on a preliminary record. Defendant adds that its continued, if residual, use of the marks in the United States is itself inconsistent with any intent to relinquish them. [D.E. 46 at 4]. Plaintiff calls that same use the deception that prompted this suit. Which characterization is right is exactly what a developed record will show.

Equitable estoppel is a distinct theory, and it fails at this stage for a distinct reason. The doctrine requires "(1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts, conduct or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated." *Bokum v. Commissioner*, 992 F.2d 1136, 1141 (11th Cir. 1993) (quoting *United States v. Aetna Ins. Co.*, 923 F.2d 1521, 1526 (11th Cir. 1991)). The reliance Plaintiff describes is its decision, after the 2025 statements, to intensify its pursuit of Sea Ray and to build a

United States subsidiary around the ULTRA MARINE mark. [D.E. 42 at 5]. Two problems with that are present in this record. The first is that the reliance Plaintiff claims is reliance on a belief that it could expand into the United States, the one market Section 2.1 forbade it to commercialize while the Agreement subsisted, and the Agreement subsisted, on Plaintiff's own account, until March 2026. [D.E. 46 at 5]. Reliance on a counterparty's statements to do what one's own contract forbids is an unpromising foundation for an equitable claim.

The second is knowledge. The first element of the doctrine is a belief induced by another's conduct, and one cannot be induced to believe what one knows to be untrue. Defendant's evidence, which includes 2022 invoice bearing the mark, and testimony placing Mr. Mašín at Defendant's Fort Lauderdale premises in or about 2020, is offered to show that Plaintiff knew of Defendant's American use throughout. [D.E. 46 at 4–5]. Plaintiff's answer is that it was "duped" in 2025 into believing that use had ended. [D.E. 42 at 6]. That may be so. But a claim that one was misled about the cessation of a known use is a fact question about what was said, meant, and reasonably understood, on which the parties' accounts diverge completely. It is not the clear entitlement a preliminary injunction requires.

In fairness to Plaintiff, several threads cut its way. Plaintiff holds the only currently live U.S. registration, while Defendant's Ultra Marine West registration was cancelled in 2022. And again section 9.8 is a written acknowledgment of Plaintiff's ownership of the logo and a genuine licensee-estoppel hook against Boyut. The 2025 "solely yours now" statements could certainly support Plaintiff's theories.

That said, the case is contested, and courts confronting contests of this kind have resolved them after development of the record, not before it. In *Open Sea*, for instance, the court denied summary judgment to both sides on ownership, first use, and implied license, on a record far more developed than this one. 692 F. Supp. 3d at 1192-96. *Watec* reached its answer only after a jury trial. *I.M. Wilson* reached its answer, twice, only after declining to reach it on a preliminary record. None of these threads converts a contested, fact-intensive record into the clear showing a preliminary injunction requires. They are reasons to try the case. They are not reasons to grant extraordinary interim relief. On the first factor, Plaintiff has not carried its burden, and that failure alone requires denial. *See also Shenzhen,* 574 F. Supp. 3d at 1216, 1245 (resolved ownership only on cross-motions for summary judgment, after "years of discovery across multiple lawsuits," on a record the court needed "some 78 pages to unpack," and it still reserved other questions for trial).

In sum, the Plaintiff's road to success on its trademark and copyright theorfies has many twists and turns, along with several contractual obstacles. Plaintiff may ultimately prevail, but it will have to develop a meaningful and compelling record to undermine the manufacturer's presumption and Defendant's defenses. Having reviewed the evidence amassed in this abbreviated proceeding, the Court sees no way in which it can make a finding at this stage that Plaintiff has a likelihood of success on all these issues. Frankly, after hearing the testimony of both sides' principals, Defendant's defenses are more persuasive. So for all these reasons the Court finds

that Plaintiff has failed to satisfy the first key requirement for injunctive relief at this stage.

***B. Plaintiff Has Not Shown Irreparable Harm***

The Court could end there given the failure to satisfy the first essential element. But we proceed to also tackle the irreparable harm question because it furnishes a second and independent ground for denial.

Irreparable harm is the "*sine qua non* of injunctive relief." *Siegel*, 234 F.3d at 1176 (quoting *Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Thus, even when movants establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper. *See Siegel*, 234 F.3d at 1176 (citing *Snook v. Trust Co. Of Georgia Bank of Savannah, N.A.,* 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of a preliminary injunction even though plaintiff established a likelihood of prevailing because plaintiff failed to meet the burden of proving irreparable injury)); *see also United States v. Lambert,* 695 F.2d 536, 540 (11th Cir. 1983) (affirming denial of preliminary injunction and stating that a plaintiff's "success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm").

Under 15 U.S.C. § 1116(a), as amended by the Trademark Modernization Act of 2020, a trademark plaintiff who has shown a likelihood of success is entitled to a rebuttable presumption of irreparable harm. The presumption is rebuttable, and on this record it is rebutted. The analysis that follows assumes the presumption's

availability, as other courts have done in materially similar circumstances. See *BeatStars, Inc. v. Space Ape Ltd.*, 624 F. Supp. 3d 681, 687–88 (W.D. Tex. 2022) ("Assuming without deciding that BeatStars could establish a likelihood of success on the merits, its own actions rebut the presumption of irreparable harm . . . .").

Irreparable harm must also be imminent, not historical. A plaintiff who has long known of the conduct it now calls an emergency undercuts its own claim of urgency: the very delay in seeking relief tends to show that the threatened injury is not the kind that cannot await trial. The Eleventh Circuit has consistently treated undue delay as a basis for finding no irreparable harm. *See Wreal*, 840 F.3d at 1248 (unexplained five-month delay "by itself, fatally undermined any showing of irreparable injury"); *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1539 (11th Cir. 1989). The leading commentator reinforces the point: "Delay in seeking a preliminary injunction tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial." 5 *McCarthy on Trademarks and Unfair Competition* § 30:48.50, quoted in *BeatStars*, 624 F. Supp. 3d at 687.

One can delay in filing a motion for an injunction after litigation has been ongoing for some time, but that is not the problem here. Instead, the other form of delay that affects the irreparable harm analysis is the delay in filing the action itself after discovering infringing activity. *See, e.g., High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (reversing grant of preliminary injunction in part because presumption of irreparable harm rebutted by

seventeen-month delay in filing the action after patent in suit was reexamined and plaintiff was aware of defendant's alleged infringement); *Apple, Inc. v. Samsung Elecs. Co.,* 678 F.3d 1314, 1325 (Fed. Cir. 2012) ("[D]elay in bringing an infringement action and seeking a preliminary injunction are factors that could suggest that the patentee is not irreparably harmed by the infringement."); *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (affirming denial of preliminary injunction because plaintiff's "failure to seek injunctive relief [by filing the action] for a period of seventeen months . . . vitiates much of the force of [its] allegations of irreparable harm"); *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (reversing grant of preliminary injunction in copyright infringement action where plaintiff who waited five months after a YouTube video was posted to seek to enjoin Google to take it down had not demonstrated irreparable harm); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276, 225 USPQ 708, 711 (2d Cir. 1985) (reversing grant of preliminary injunction in trademark infringement in part where nine-month delay in filing the action undercut claim of irreparable harm) ("Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.").

Here the delay is measured not in months but in years. Defendant's evidence shows that Plaintiff's principal knew of Defendant's United States use of the very stylized mark long before suit: an invoice from Defendant to Mašín in late 2022 that displayed the mark, a visit by Mašín to Defendant's Fort Lauderdale premises in or

about 2020, and a course of use that went unobjected-to for roughly a decade. [D.E. 46 at 2, 4-6]. Courts have found far shorter delays fatal. *See, e.g.*, *Wreal*, 840 F.3d at 1248 (five months); *BeatStars*, 624 F. Supp. 3d at 688–89 (nine months; collecting cases denying relief for delays of five to eighteen months); *Northern Trust Corp. v. Carl Domino, Inc.*, No. 05-80678-CIV, 2006 WL 8433639, at 9-11 (S.D. Fla. Mar. 13, 2006) (nine-month delay between first knowledge of the infringing activity and the pursuit of preliminary relief "clearly undercuts" the claim of irreparable harm and overcomes any presumption of it), *adopted*, 2006 WL 8433658 (S.D. Fla. Apr. 14, 2006).

Plaintiff's counter on this issue is that Defendant's use was licensed until Boyut terminated the Agreement on March 18, 2026, and that a party has no need to object to a use it has authorized. The principle is sound, and Section 9.8(iii) certainly supports a finding that a license existed. But the license argument is not dispositive. The Section 9.8 license ran to Boyut, not to Ultra Marine West. It covered the Logo and Design, not the ULTRA family, which section 9.8 assigns to Boyut outright. And the Agreement in which it sits is bounded by a Territory that excludes the United States. Plaintiff therefore had every occasion to object to American use by an American company, because nothing in the Agreement authorized it. A movant cannot explain away a decade of silence by pointing to a license that does not cover the conduct or the party at issue. (There is of course the possibility that it did not believe it was entitled to claim any ownership of marks for U.S. commerce, at least

until it had a falling out with the manufacturer. Either way, the case for irreparable harm fails).

Defendant's position is more persuasive. Defendant does not say it used the marks by Plaintiff's leave. It says it never needed Plaintiff's leave, i.e., that its U.S. use rested on Boyut's own senior rights, exercised through a U.S. distributor since 2006. If that is right, Plaintiff's silence was not a licensor's forbearance; it was a stranger's acquiescence.

Plaintiff's principal explanation for the delay, however, is not the license but the lull. Plaintiff says that Defendant's 2025 assurances that ULTRA MARINE was "solely yours now" relieved it of any need to sue; that those assurances continued into January 2026; and that it moved within weeks once it discovered, at the February 2026 Miami Boat Show, that Defendant was still using the mark. [D.E. 42 at 5–6].

Admittedly, delay is not necessarily fatal, and a court must consider the movant's explanation for it. *Wreal*, 840 F.3d at 1248. But this explanation has a chronological gap at its center. The lull, on Plaintiff's own telling, began in January 2025. Defendant's use of the mark in the United States (including the invoice sent to Mr. Mašín and the Fort Lauderdale operation he personally visited) dates from years before. Statements made in 2025 cannot explain silence in 2020, 2022, 2023, or 2024. And Plaintiff itself concedes that Defendant "often characterized its statements as limited to Europe." [D.E. 42 at 3 n.1]. Assurances about Europe are an odd foundation for a belief that American use had ceased.

Plaintiff's own authority makes the point. In *Western Sizzlin Corp. v. Pinnacle Business Partners, LLC*, No. 6:10-cv-1452, 2011 WL 5878043 (M.D. Fla. Nov. 23, 2011), that Plaintiff relies on for the proposition that assurances of reform can excuse delay, the court rejected exactly that argument. A defendant's assurance that it would change an infringing sign "could in theory 'lull' a party into delaying the filing of suit for the length of time needed to change—or at least remove—the sign, perhaps a few weeks," but "would not be enough to lull a party into delaying for more than forty-eight months," particularly where nothing "prevented the Plaintiff from visiting the restaurant, or even just driving by it, to see if the sign had been changed." *Id.* at *3. Nothing prevented Plaintiff from doing the equivalent here. Defendant's premises are in Fort Lauderdale, Plaintiff's principal had been there, and Plaintiff's own account is that a single visit to a Miami trade show in February 2026 revealed everything it needed to know.

Nor does the explanation improve on closer inspection of what Plaintiff says it learned in February 2026. On Plaintiff's account, what it discovered at the Miami Boat Show was that Defendant continued to use marks Defendant had said it was leaving behind. Defendant's account is that the rebrand to ULTRA PRODUCTS was real but incomplete, with "some residual uses remaining due to unexpected delays." [D.E. 46 at 5]. If Defendant is right, the conduct Plaintiff seeks to enjoin is a diminishing remnant of a use Plaintiff tolerated for years. If Plaintiff is right, it was deceived, and its remedy for deception lies in damages and in the equitable doctrines

it may press at trial. On neither account is the harm of a kind that could not have been raised years earlier, or that cannot await final judgment.

The remaining decisions Plaintiff cites for the proposition that a defendant's assurances can excuse delay address, as Plaintiff describes them, whether a claim is barred by laches or limitations. [D.E. 42 at 6 & n.6]. But they do not speak to the different question whether the extraordinary remedy of interim relief is warranted. Defendant, for its part, frames part of its argument in the language of laches as well. [D.E. 46 at 6]. The Court does not decide whether laches bars anything. It decides only that "a particular period of delay [that] may not rise to the level of laches" may "still indicate an absence of the kind of irreparable harm required to support a preliminary injunction," *Citibank*, 756 F.2d at 276, and that this one does.

The chronology further compounds the problem. Boyut terminated the Agreement for cause on March 18, 2026. Plaintiff filed this suit five days later, on March 23, and sent its ownership-and-rejection notice the day after that, on March 24. That sequence is consistent with a response to being terminated rather than a response to some newly discovered, urgent threat to Plaintiff's mark. And among the grounds Boyut invoked was Plaintiff's filing of United States trademark applications "during the continuation of the distributorship relationship." Notice of Termination ¶ 6. A preliminary injunction is not designed to be a strategic counter-move in what is primarily a contract dispute. And even if it was, it has to be timely presented so that the showing of irreparable harm is palpable, not tenuous.

Two further considerations bolster this conclusion. First, much of the injury Plaintiff asserts (lost sales, lost margin on a distribution business) is the sort of harm that money damages can repair. Harm that can be remedied by a later money judgment is, by definition, not irreparable. Second, Plaintiff's most vivid accusation — that Defendant was "caught switching logos," swapping its booth backdrops at the Palm Beach show as if to hide a guilty mark — loses much of its force on the full record. Defendant offered a credible explanation: the new "ULTRA PRODUCTS" backdrops were ordered in advance, arrived late on March 23, 2026, and were installed before the show opened to the public, not in guilty reaction to service of process. The Court heard testimony on this point and found that explanation credible.

There is an additional feature of that episode worth noting, because it bears on the fit between the harm Plaintiff describes and the relief Plaintiff seeks. The conduct Plaintiff calls its clearest evidence of irreparable injury is Defendant's move away from the contested marks and toward "ULTRA PRODUCTS." An injunction forbidding Defendant to use the contested marks would not redress a harm arising from Defendant's choice to cease using them. We need not rest on the point, and so no independent causation requirement is being adopted. But the observation reinforces what the delay analysis already establishes.

It is also true that any plausible claim of infringement carries with it the real threat of irreparable harm. As the Eleventh Circuit recently found in *Deltona Transformer Corp. v. The NOCO Co.*, No. 24-13590, at 40 (11th Cir. Aug. 4, 2026), "infringement by its nature causes irreparable harm," quoting *Tally-Ho, Inc.,* 889

F.2d at 1029). Read broadly, that sentence would make irreparable harm automatic in every trademark case.

But it does not bear that reading here, for two reasons. The proposition presupposes infringement. *Tally-Ho* tells a court what follows once a violation is shown; it does not tell a court that a violation has been shown. And *Deltona* applied it in the posture of a permanent injunction, after a jury verdict, under the four-factor standard of *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A rule that describes the consequence of adjudicated infringement cannot substitute for the showing of likely infringement that Rule 65 demands at the threshold. And in particular here, "[t]he statutory presumption does not mean that a trademark owner is automatically entitled to a preliminary injunction. . . . For example, delay in moving for a preliminary injunction is often cited as a reason for denying a preliminary injunction." 5 *McCarthy* § 30:47, quoted in *BeatStars*, 624 F. Supp. 3d at 687.

Contrast this case with another one in this district that granted a preliminary injunction on this same framework, *Frumar Agri Foods (P) Ltd. v. RRK Foods Inc.*, 2025 WL 2408431 (S.D. Fla. Aug. 18, 2025). There the court held the § 1116(a) presumption applicable, held that "a sufficiently strong showing of likelihood of confusion . . . may by itself constitute a showing of a substantial threat of irreparable harm," citing *McDonald's Corp.,* 147 F.3d at 1310, and held loss of reputation, goodwill, and quality control gave rise to irreparable harm, citing *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190-91 (11th Cir. 2005).

Four differences separate that case from this one. The movant in *Frumar* was the manufacturer, and the presumptions that carried the day there ran in the manufacturer's favor. Here the movant is the distributor and clearly not the manufacturer with whom it had an agreement that did not include the U.S. market. Delay played no part in *Frumar*. And *McDonald's* and *Ferrellgas* describe what kind of harm counts as irreparable rather than what happens when a movant sits on its claim for years. Further, uncontested likelihood of confusion was at the forefront in *Frumar*; the dispute here is not about confusion at all, but about ownership that is very much contested.

The Court notes as well that in *Open Sea*, the manufacturer-side plaintiffs were themselves denied a preliminary injunction for failure to show "imminent irreparable harm," and the case then proved incapable of resolution even at summary judgment. 692 F. Supp. 3d at 1170. Similarly, this Plaintiff has not shown a likelihood of irreparable harm. That independent failure is a second and sufficient ground for denial.

Given that the first two lynchpins for injunctive relief have not been sustained, we need not elaborate on the remaining factors in the analysis. But we note only that with Defendant claiming roughly two decades of ULTRA-brand goodwill and a long-established U.S. distribution business, the broad injunction Plaintiff requests would inflict concrete harm on a party that, on this record, appears to be the senior user, while Plaintiff's countervailing harm is largely compensable in damages. The balance of hardships would thus seemingly tilt in Defendant's favor as well.

The public interest points the same way, and for a reason particular to disputes of this kind. Where a single mark is split between a foreign manufacturer and a national distributor, the public risk is not that the wrong party will prevail but that purchasers will get something other than what the mark has taught them to expect. The court in *I.M. Wilson* identified the problem precisely: "split ownership of the trademark and associated products" meant that "people are expecting to purchase Russian-made ballet items when they purchase GRISHKO products and are instead purchasing whatever products I.M. Wilson is now selling to which it simply affixes the name 'GRISHKO,'" and the distributor's assurance that it could "put the GRISHKO trademark on any type of goods it wishes because it owns the mark" was "a somewhat troubling assertion." 397 F. Supp. 3d at 744-45. Boyut has stopped supplying Plaintiff. An injunction awarding Plaintiff the exclusive United States use of a mark that American purchasers associate with Turkish-manufactured Boyut anchors would present the same difficulty.

We need not go further on this motion. And we certainly do not foretell what will happen when further factual development takes place and the case is litigated to a more record-based conclusion. For now, we only find that injunctive relief should not be entertained given the complex and hotly debated issues in this international case, from which we cannot find that Plaintiff will most likely succeed on the merits, or that Plaintiff has shown irreparable harm under the circumstances. A preliminary injunction is a remedy of equity, reserved for the party whose right is clear and whose injury cannot wait. Plaintiff may yet prove its case. But it has not shown, on this

record, that it is likely to win or that it will suffer irreparable harm in the meantime. And without those showings, an injunction cannot lie.

## *IV. CONCLUSION*

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction [D.E. 6] is **DENIED**.[1]

**DONE AND ORDERED** in Chambers at Miami, Florida this 21st day of September, 2026.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

[1] The motion is adjudicated by Order as no dispositive relief is being proposed and for administrative purposes. If any party seeks to object to or appeal the Court's findings on the motion, the Court reserves the party's right to seek *de novo* review under Local Rule 4(a), and in which case the District Judge shall treat the Order as a Report and Recommendation.